## OWENS et al.
v.
## AMERICAN STEREOGRAPHIC CORP. et al.

United States District Court
S. D. New York.

Sept. 30, 1953.

------◆------

Martin J. Scheiman, New York City, for plaintiffs.

Emanuel R. Posnack, New York City, for defendants American Stereographic Corp., Leonard H. Maurer, Norman Maurer, Joseph Kubert and Archer St. John.

CONGER, District Judge.

This is a motion for a preliminary injunction restraining the defendants from making and distributing three-dimensional comic books or magazines produced by a certain "3-D Illustereo" process upon the ground that said process infringes United States Letters Patent No. 2,057,051 issued to plaintiff Owens on October 13, 1936.

The plaintiff Gaines is the assignee of the Owens patent and is president of the various corporate plaintiffs.

The defendant American Stereographic Corporation is the owner of the Illustereo process, the defendants Leonard H. Maurer, Norman Maurer and Joseph Kubert are officers of said corporation, the defendant St. John is the owner of the St. John Publishing Company, which has used the Illustereo process in the production of comic books, the defendant American News Company is the distributor of magazines and comic books including those of St. John Publishing Company. The defendant Lionel Corporation is a New York corporation and is joined because its advertisement appearing in a publication of the St. John Publishing Company employed the Illustereo process.

The plaintiffs have filed various exhibits as well as a number of affidavits in support of their motion.

According to the affidavit of the plaintiff Gaines, the corporate plaintiffs are well known publishers of comic books and he is well acquainted with the efforts involved in the production and knowledge of stereoscopy and the aspects of its production through the medium of photography; he is the assignee of the Owens patent and has made a study of it. He sets forth his analysis of the patent which is entitled "Methods of Drawing and Photographing Stereoscopic Pictures in Relief"; the first two paragraphs of the patent set forth the nature of the invention and its purposes as follows:

"This invention relates to improved stereoscopic pictures intended for amusement, educational and advertising purposes having objects displayed in sharp relief in the foreground and background, and aims to produce such pictures by combining drawings or photographs of different subjects or views in a simple, rapid and inexpensive manner readily adapted to the existing types of cameras and picture making devices.

"Further aims and objects of the invention appear in connection with the following description of a preferred mode of production and use, illustrated in the accompanying drawings, the subject chosen for illustration being a newspaper drawing depicting a popular character of serial adventure stories as utilized for giving publicity to a well-known nationally advertised product."

The Owens patent technique embraces according to Gaines the following production steps:

"(a) analyzing the drawing and breaking it down into the desired number of planes;

"(b) copying each plane, either by hand or photographically, on to a separate sheet or transparent cell (acetate, celluloid or the like) or a combination thereof, and, in the case of transparent cells, opaquing the areas covered with white where and if desired;

"(c) superimposing the sheets and/or cells in register to simulate the original drawing and then copying photographically;

"(d) shifting the sheets and/or cells laterally with reference to the background so that each sheet or cell is shifted slightly more in reference to the preceding one, which shift distances may be varied in amounts and in proportion to each other, and then copying the composite result photographically;

"(e) the photographic copies produced or obtained through steps (c) and (d) above described are then reproduced for visual observation.

"Reproduction for visual observation is achieved in the following manner: plates are made from each of the two photographic copies referred to in the process outlined above; one being usually inked in red and the other in green, and a printing is then made with the impression of each plate superimposed. When viewed through color filters of the same two colors that the said plates were respectively inked in, a three dimensional effect is obtained through the application of well-known and, concededly, not now patentable principles of 'stereo-analyglyph' viewing."

He reminds the Court of the "3-D" craze and the profits to be reaped, and he describes the efforts of the defendants in marketing the "World's First Three Dimension Comics" under a so-called secret "illustereo" process for which patent application is pending; he further describes his negotiations with defendant for a license to employ the process in his own publications and his refusal to accept the same because of the conditions imposed therein; he charges that the defendants actually never had intention of licensing anyone other than St. John Publishing Company and that defendants are out to corner the market in 3-D

comic books; he cites an announcement in a trade magazine by one of the defendants and inventors, Kubert, to the effect that there will be an immediate but short-lived market for 3-D comics and "then it will be all over"; the announcement also refers to the problem of acquiring glasses for the comic books because of the limited supply of acetate in New York; this points up the difficulty because it takes Gaines' companies several months to produce a 3-D comic book.

Mr. Gaines' affidavit further goes on to relate his discovery, during the course of the license negotiations, of Owens' patent; that he became absolutely convinced the defendants were employing the Owens process; and he is equally convinced the defendants infringe the Owens patent since the "naked eye tells the story"; he studied defendants' work and can't think of any method other than Owens' that might have accomplished the result.

Mr. Gaines' affidavit winds up by "challenging" defendants to admit or deny the use of certain practices in their production and pleads the necessity of the relief sought, because of the defendants continuing publication despite full notice of plaintiffs' rights, the limited (in time) market, the limited source of supplies created by defendants' activities and the fact that the Owens patent expires October 13, 1953.

The affidavit of plaintiff Owens recites, among other things, his invention, his belief that defendants infringe, his failure ever successfully to promote the patent, or to receive one penny from it, his experience as an inventor, his introduction to the defendants' claimed infringing production, the receipt of a visit from plaintiff Gaines and subsequent conversations with the latter after which he assigned his patent to Gaines, his notification to defendants of infringement and various replies. He has no doubt that defendants use his technique in their productions, for the same reasons Gaines gives.

One Feldstein, a commercial artist and employee of the plaintiff corporations, also expresses the opinion that "only one of the methods invented, taught and detailed in the Owens patent could have been used in the production of that ('Mighty Mouse') comic book * * *."

Similar opinions are expressed by certain persons named Geis and Kast, apparently strangers to this controversy, who have had experience in stereoscopy.

Further, one George Hanlin files an affidavit in support of the application. Hanlin is no less than the Government patent examiner, now retired, who examined and allowed the Owens patent in 1936. It is his opinion that the Owens patent was and is valid in every way. This opinion results from a refreshed recollection and further study by Mr. Hanlin. He is further of the opinion that if defendants use certain processes in producing their comic books, they infringe the Owens patent.

One Elder, a commercial artist, formerly a free-lancer, but now employed by the plaintiff corporation, relates that he visited the offices of American Stereographic Corporation in June of this year and that defendants Kubert and Norman Maurer explained to him the process by which defendants' comic book "Mighty Mouse" had been produced. He is of the opinion that it "is undoubtedly the process invented and taught by Mr. Owens."

One exhibit is a transcript of a tape recorded interview between defendant Kubert and plaintiff Gaines and plaintiff corporations' employee Feldstein at Gaines' office in August of this year. It appears that Kubert was invited to Gaines' office by Gaines and/or Feldstein for a little chat and, unknown to Kubert, the conversation was tape recorded—70 pages in all.

I read the entire transcript. Without giving consideration to its propriety or admissibility—plaintiffs have filed a memorandum in support of the submission—I can only conclude that it completely establishes that Kubert was innocent of any wrongdoing in connection with Owens' patent and the publication of defendants' 3-D comic books. Further, I regard it as worthless in establishing any impropriety on the other de-

-fendants' part. The conversation consisted mainly of Gaines' and Feldstein's relation to Kubert of what they had learned, suspected, speculated and otherwise. Kubert was astonished by some of the revelations but he was unaware of wrongdoing on his own part or anybody else's, except possibly, if what he was told was true, a certain lawyer's part.

The defendants have filed affidavits in opposition to the application.

Leon (Leonard) H. Maurer, general manager of the defendant American Stereographic Corporation, states that he, in conjunction with Norman A. Maurer and Joseph Kubert, invented the process whereby defendants produce 3-D comic books; that a patent has been applied for along with a petition for "special" attention in order to expedite the application; that defendants sought to license Gaines and his companies but the latter would not agree to the conditions in connection with secrecy of the process; he states that Owens' patent has no relation to defendants' process; he is of the opinion, after study, that the Owens patent is and always was invalid in view of the prior art which he purports to cite; that the St. John Publishing Company has invested three-quarters of a million dollars in the project and the plaintiffs have yet to produce a comic book.

Archer St. John relates his part in the production, his substantial investment, the great success of the venture, his belief after investigation that his process infringed no patent, among other things.

Norman H. Maurer states that he is a coinventor of the Illustereo process; that it is different than the disclosures of the Owens patent; and that such Owens process is not capable of producing a product of the quality of defendants' comic book.

Paul Terry, a producer of well-known animated motion picture cartoons, states that he has used, since 1915, a process relating to the creation of 3-D effects from a drawing which process is described in many old patents, which he cites.

I believe I have given the highlights of the various affidavits and I have considered the exhibits.

I am convinced that the plaintiffs have not made a case for the relief sought.

Certain well-known criteria are applied in the exercise of a Court's discretion in granting or denying a preliminary injunction in a suit for patent infringement. And there is sufficient reason for denying an injunction where the validity of the patent is not clearly and convincingly shown, Stoody Co. v. Osage Metal Co., 10 Cir., 1938, 95 F.2d 592; Haynes Stellite Co. v. Stoody Co., 9 Cir., 1938, 94 F.2d 418; Simson Bros., Inc., v. Blancard & Co., Inc., 2 Cir., 1927, 22 F.2d 498; or where infringement is not reasonably clear, Diamond Power Specialty Corp. v. Bayer Co., 8 Cir., 1938, 95 F.2d 541. Further, it goes without saying that a condition for the issuance of an injunction pending trial in any case is the irreparable damage that may otherwise follow. Lawrence v. St. Louis, etc., Ry. Co., 1927, 274 U.S. 588, 47 S.Ct. 720, 71 L.Ed. 1219.

I shall assume for the purposes of this application that the Owens patent is valid.

It is plain from all the circumstances, however, that defendants' infringement of the Owens patent is not reasonably clear, if at all.

Only Elder among the affiants in support of the application has any knowledge of defendants' process. Gaines and others cannot think of any method other than disclosed in the Owens patent to do the job. Hanlin says in effect that if the defendants use the Owens method they infringe the Owens patent.

Elder's affidavit remains practically unanswered. Of course, in general the defendants deny using the Owens patent, aver that the Owens method has no relation to their own and have their own invention for which they seek a patent. But they do not deny that their method was explained to Elder nor do they counteract Elder's opinion that it is the Owens method.

This circumstance along with others raises a suspicion that the defendants may have appropriated Owens' work. I do not, however, regard it as clear proof of infringement in view of defendants' denials and averments, and particularly since defendants have seen fit to file their own "invention" in the patent office.

This doubt coupled with the fact that the plaintiffs will not be irreparably damaged by defendants' continued production compels me to deny this application. There appears to be no question that the defendants are financially secure and well able to compensate plaintiffs if and when they are successful in this suit. It may well be three years before it reaches trial, yet the patent will be in the public domain within a month. Even assuming that the defendants saturate the market within a short time, it may not be said that they are sole contributors to this circumstance since it appears that at least one other company is in the field.

The application is denied.

Settle order.